UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES ex rel. BID SOLVE, INC.,** | |
| Plaintiff's Address:<br>Bid Solve, Inc.<br>567 Crystal Lane<br>Strasburg, VA 22657 | **UNDER SEAL PURSUANT TO<br>31 U.S.C. §3730(b)(2)** |
| *Plaintiff/Relator,* | Case: 1:19–cv–01861 (Jury Demand)<br>Assigned To : McFadden, Trevor N.<br>Assign. Date : 6/25/2019<br>Description: General Civil (E-DECK) |
| v. | |
| **CWS MARKETING GROUP, INC.,** | |
| **C. WILLIAM STEARMAN, and** | |
| **JENNIFER STEARMAN** | |
| *Defendants.* | |

## COMPLAINT

Plaintiff Bid Solve Inc., acting as a *qui tam* relator on behalf of the United States, brings this Complaint against defendants CWS Marketing Group, Inc., C. William Stearman and Jennifer Stearman, and alleges as follows:

### Introduction

1.  This is an action to recover damages and civil penalties on behalf of the United States for Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA").

2.  In April of 2017, defendant CWS Marketing Group, Inc. ("CWS") submitted a proposal in response to a solicitation by the Internal Revenue Service, Office of Treasury Procurement Services (the "IRS OTPS") for property auction services (Solicitation A17021).

1

That solicitation was set-aside for "small" businesses. Under the circumstances of that solicitation, "small" means average annual revenue over the preceding three most recently completed fiscal years of no more than $7.5 million.

3.    In connection with that April, 2017 proposal, CWS certified that it was "small" under that test. Unknown at the time to IRS OTPS, CWS's certification was false.

4.    IRS OTPS awarded the contract—worth more than $41 million—to CWS.

5.    When a competing bidder, plaintiff/related Bid Solve, submitted a protest to the Small Business Administration (the arm of the United States government responsible for "size determinations"), CWS responded by submitting to the Small Business Administration "proof" that its annual revenue was below the $7.5 million threshold. That "proof" included its prior false certification, along with tax returns that falsely understated CWS's revenue. In reliance upon that false "proof," the Small Business Administration issued a size determination in favor of CWS, finding that CWS's was "small."

6.    As a result, CWS is currently performing under the IRS OTPS contract, and in connection therewith has submitted, and continues to submit, claims for payment to the United States. Because CWS obtained the contract through knowing misrepresentations, and because CWS's claims for payment implicitly certify that CWS had a legal right to the award of that contract, those claims for payment are "false" within the meaning of the False Claims Act.

7.    Plaintiff/relator Bid Solve brings this *qui tam* action to obtain redress, in the form of treble damages, statutory penalties and injunctive relief, on behalf of the United States.

## Jurisdiction and Venue

8.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

9.     This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because the Defendants have transacted and continue to transact business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because Defendants transacted and continue to transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

11.     This case is not based on a public disclosure within the meaning of the FCA, and Relator is the original source of the allegations contained herein.

## Parties

12.     Plaintiff/Relator Bid Solve, Inc. is a corporation organized under the laws of the State of Virginia with its principle place of business in Strasburg, Virginia.

13.     Defendant CWS Marketing Group, Inc., is a corporation organized under the laws of the State of Florida with its principle place of business in Manassas, Virginia.

14.     Defendants C. William Stearman and Jennifer Stearman are the owners and operators of CWS Marketing Group., Inc.  C. William Stearman is the President, and Jennifer Stearman is the CEO, of CWS Marketing Group, Inc.  They are husband and wife, and they reside in Carmel, Indiana.

15.     The United States is herein named as a Plaintiff pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly disbursed and awarded to Defendants, as a result of the knowingly false claims, records and statements alleged in this Complaint made by or caused to be made by Defendants.

## Facts

16.     Paragraphs 1 through 15 are incorporated herein by reference.

17.     Pursuant to the Small Business Act, 15 U.S.C. §§ 631–657, the U.S. Small Business Administration (the "SBA") maintains a small business government contracting program whereby certain federal government contracts are set-aside for companies that fall below certain size thresholds.

18.     The law requires at least 23% of federal contract dollars to be awarded to small businesses.  In fiscal year 2017, the most recent fiscal year for which statistics are available, the federal government awarded 23.88% of its contact dollars to small businesses, totaling $105.7 billion.

19.     The Small Business Act, and its implementing regulations, determine a company's eligibility for the small business set-asides according to either an employee-based or revenue-based size standard.  The size standard varies depending on the applicable industry as classified according to the North American Industry Classification System ("NAICS").  There are hundreds of individual NAICS codes which correspond to specific industry and which carry a size specific size standard below which a company in that industry is considered "small," ranging from $750,000 to $38.5 million for revenue-based size standards and 100 to 1,500 employees for employee-based size standards

20.     The contract at issue here (IRS Contract 2032H318C00002) was classified under the 561790 NAICS code—the "Other Services to Buildings and Dwellings" industry—which carries a $7.5 million size standard.  Thus, to be eligible to compete for a federal government contract in this NAICS code set-aside for small businesses, a company's revenue calculation must be below $7.5 million.

21.     For purposes of the size standard, the "size" of a business is measured as of the date when the business submits a written size self-certification as part of an offer in response to a contract solicitation from the government.  13 C.F.R. § 121.404(a)(1).

22.     For purposes of a compliance with the size standard, a company's revenue calculation is its average annual revenue for the three most recently completed fiscal years.  So, in order to be below a $7.5 million size standard, a company could have total revenue over the preceding three completed fiscal years of no more than $22.5 million.  *See generally*, 13 C.F.R. § 121.104.

23.     For purposes of the SBA's size regulations, revenue equals "total income" as reported on Internal Revenue Service ("IRS") tax return forms (e.g., Form 1120 for corporations, Form 1065 or 1040 for LLCs).

24.     SBA's regulations have only limited and strict exceptions which allow a company to deduct any amount from its "total income," as reported on its tax returns, for purposes of determining its size.  Those exceptions which may be excluded from total income are net capital gains or losses; taxes collected for and remitted to a taxing authority if included in gross or total income, such as sales or other taxes collected from customers and excluding taxes levied on the concern or its employees; proceeds from transactions between a concern and its domestic or foreign affiliates; and amounts collected for another by a travel agent, real estate agent, advertising agent, conference management service provider, freight forwarder or customs broker. The SBA rules are clear that these are the only exceptions and all other items such as subcontractor costs, reimbursements for purchases a contractor makes at a customer's request, investment income, and employee-based costs such as payroll taxes, may not be excluded from receipts.

25.     Generally, the SBA's small business government contracting program is a self-certifying system. That is, contractors competing for contracts set-aside for small businesses must certify in their bid or proposal that they meet the applicable size standard but there is no routine review to determine whether the contractor actually meets the size standard. Rather, the SBA maintains a protest system whereby other contractors that lose the competition for the set-aside contract may file a protest with the SBA alleging that the winner does not qualify under the applicable size standard. When a protest is filed, the SBA will require the protested company to complete an SBA Form 355 to gather information on the company's revenues and as well as business structure and operations. The SBA Form 355 is signed under oath by a representative of the company. The SBA Form 355 also requires the submission of supporting documentation, especially the company's tax returns, so that the SBA may make a so-called "size determination," i.e., determine whether or not the protested company does, in fact, meet the applicable size standard. If the SBA determines that the protested company is other than small, the government must cancel the contract award to the protested company and award the contract to the company next in line for award.

26.     In making a size determination, tax returns are the only evidence that the SBA will use to determine a company's revenue except in the limited case where the company has not yet filed a tax return for a fiscal year that must be included in the period of measurement. In such a case, and only in such a case, the SBA will use other information that is available, such as the company's audited financial statements or its regular books of account.

27.     The SBA office responsible for making size determinations is the regional area office serving the area in which the protested company's business headquarters is located. After the area office makes a size determination, either the protester or the protested company may

6

appeal the area office's size determination to the SBA's Office of Hearings and Appeals

("OHA"), which employs Administrative Judges to hear the appeals and maintain uniformity in

the SBA's interpretation and application of its size regulations.

28.     On March 10, 2017, the IRS Office of Treasury Procurement Services (the "IRS

OTPS"), located in Washington, D.C., issued a solicitation for property auction services

(Solicitation A17021) which was set-aside for small businesses under the 561790 NAICS code,

which carries a $7.5 million size standard.

29.     The IRS OTPS solicitation required that any proposal submitted in response

thereto had to include a certification that the offeror met the $7.5 million size standard.

30.     On or about April 12, 2017, defendant CWS and plaintiff/relator Bid Solve each

separately submitted timely proposals to the IRS OTPS in response to the solicitation.  In their

proposals, CWS and Bid Solve each certified that they were "small," *i.e.*, that they met the $7.5

million revenue size standard.

31.     CWS's certification was knowingly false.

32.     On February 21, 2018, the IRS OTPS issued a pre-award letter which informed

both of the offerors that the IRS OTPS had decided to make an award to CWS.

33.     The total contract price of the contract awarded by the IRS OTPS to CWS was

$41,233,956.

34.     CWS's certification that it was "small," *i.e.*, that it met the $7.5 million revenue

size standard, was material to the decision of IRS OTPS to award the contract to CWS.  Indeed,

if CWS has not made that certification, it would not have qualified for the contract, the IRS

OTPS would not have awarded the contract to CWS.

35.     On February 22, 2018, Bid Solve filed a size protest with the SBA alleging the CWS had revenue that exceeded the $7.5 million size standard.  This protest was administered by the SBA's Area II Office of Government Contracting (the "SBA Area Office"), which designated the protest as Size Determination Case No. 02-2018-228.

36.     In response to that size protest, CWS again falsely stated, this time to the SBA Area Office, that it was "small" within the $7.5 million revenue size standard.

37.     In support of that false statement to the SBA Area Office, CWS provided the SBA Area Office with what CWS claimed was supporting documentation.  That supporting documentation included CWS's completed SBA Form 355, CWS's financial statements for 2014, 2015 and 2016, and CWS's federal tax returns for 2014, 2015 and 2016.

38.     On April 4 2018, the SBA Area Office issued its size determination.  Relying on the 2014-1016 tax returns that CWS had submitted, the SBA Area Office concluded that "[t]he three year average for CWS is below $4.5 million" and thus that "CWS is a small business concern for the applicable size standard of $7.5 million."

39.     The 2014-2016 tax returns that CWS submitted to the SBA Area Office contained knowingly false statements concerning CWS's revenue for those years.  In fact, CWS's actual average revenue for those years greatly exceeded $7.5 million.

40.     Defendants C. William Stearman and Jennifer Stearman knew or should have known that the 2014-2016 tax returns that CWS submitted to the SBA Area Office contained false statements concerning CWS's revenue for those years.  Defendants C. William Stearman and Jennifer Stearman caused CWS to make the false statements, and submit the misleading documents, as alleged herein.

8

41.     The false statements contained in the 2014-2016 tax returns that CWS submitted to the SBA Area Office were material to the SBA Area Office's size determination. Indeed, those tax returns, and the statements made in those tax returns concerning CWS's revenue, were the sole basis for the SBA Area Office's size determination.

42.     If Defendants had not made false statements in the 2014-2016 tax returns that CWS submitted to the SBA Area Office, Bid Solve's size protest would have been sustained by the SBA Area Office, and as a result CWS would not have been awarded the contract by IRS OTPS.

43.     Plaintiff/Relator's allegation that CWS's 2014-2016 average annual revenue exceeded $7.5 million, and thus that CWS made material false statements to both IRS OTPS and the SBA Area Office as set forth above, is based upon at least the following facts, which separately and/or collectively satisfy the "plausibility" standard established by Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007):

        a.      One of Bid Solve's current principles, Erik Rayburn, was formerly the controller of CWS from approximately June of 2012 through October of 2014. As controller, Mr. Rayburn was intimately familiar with CWS's finances and its activities in connection with the contract that CWS had with various governmental entities during that period of time. Based upon what he observed as controller of CWS, Mr. Rayburn has personal knowledge that CWS's revenue for 2014 exceeded $7.5 million.

b.      During the 2014-2016 time-frame, CWS was the prime contractor on a contract with the Department of the Treasury designated TOS-12-D-0004.  Under this contract alone, CWS received revenue of approximately $22,370,000.

c.      In addition, during the 2014-2016 time-frame, CWS had a contract with Los Angeles County to perform auction services.  Between January, 2014 and December, 2016, CWS received revenue, in the form of fees for providing the auction services, totaling approximately $530,000.

d.      In addition, in late 2014, CWS was awarded a contract with Customs and Border Patrol (HSBP1015A00003).  Between December, 2014 and December, 2016, the funding for that contract was approximately $954,000.  Although Plaintiff/Relator does not know for an absolute certainty whether CWS was actually paid that full amount, this was a fixed-price contract; accordingly, it is more likely than not that CWS was paid all, or almost all, of the funded amount.

e.      In addition, throughout the entire 2014-2016 time-frame, CWS was a subcontractor on a contract issued by the U.S. Department of the Treasury, Internal Revenue Service, Office of the Treasury Procurement Services (TEOAF13D0001). Based upon Mr. Rayburn's knowledge from his time as controller, he estimates that CWS received revenue of at least $125,000 per month under that subcontract.  Accordingly, he estimates that during the 2014-2016 time-frame, CWS had total revenue of $4,500,000 from this subcontract.

f.      Accordingly, from these sources alone, during the 2014-2016 time-frame, CWS had revenue of approximately $28,354,000, for an average annual revenue of approximately $9,451,333.

g.      Based on his knowledge of CWS's businesses from his time as its controller, Mr. Rayburn believes that CWS likely had other sources of incomes as well that, if fully accounted for, would drive CWS's average annual revenue for the 2014-2016 time-frame even higher.

44.     Upon information and belief, CWS has submitted multiple claims to the United States for payment under Contract 2032H318C00002. All such claims were false or fraudulent as a result of CWS's knowingly fraudulent procurement of that contract, and also as a result of CWS's implicit misrepresentation, in connection with each such claim, that CWS is lawfully entitled to payment.

### Count One: 31 U.S.C. §3729(a)(1)(A)

45.     Paragraphs 1 through 44 are incorporated herein.

46.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

47.     As a result of these false or fraudulent claims, the United States Government suffered damages.

### Count Two:  31 U.S.C. §3729(a)(1)(B)

48.     Paragraphs 1 through 45 are incorporated herein.

49.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

50.     As a result of these false records or statements, the United States Government suffered damages.

## Prayer For Relief

WHEREFORE, Plaintiff/Relator prays for the following relief:

1.      A permanent injunction requiring Defendants to cease and desist from violating the False Claims Act;

2.      Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendants' unlawful conduct;

3.      Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants;

4.      An award to Relator pursuant to 31 U.S.C. §3730(d);

5.      An award of reasonable attorneys' fees, costs, and expenses; and

6.      Such other relief as the Court deems just and equitable.


## JURY DEMAND

Plaintiff/Relator hereby demands a jury trial on all issues triable to a jury.

Respectfully Submitted,

Jonathan K. Tycko
D.C. Bar No. 445851
TYCKO & ZAVAREEI LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 973-0900
jtycko@tzlegal.com

Ryan C. Bradel
D.C. Bar No. 989314
WARD & BERRY PLLC
2000 Pennsylvania Ave., Suite 4500
Washington, D.C. 20005
(202) 331-8160
rbradel@wardberry.com

*Attorneys for Plaintiff/Relator*